# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAL COBURN BROWN,
          *Petitioner-Appellant,*

          v.

JOHN LAMBERT, Superintendent of
Washington State Penitentiary,
          *Respondent-Appellee.*

No. 04-35998

D.C. No.
CV-01-00715-JCC

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief Judge, Presiding

Argued and Submitted
July 14, 2005—Pasadena, California

Filed December 8, 2005
Amended June 19, 2006

Before: Stephen Reinhardt, Alex Kozinski and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Kozinski;
Dissent from Denial of Rehearing En Banc by
Judge Tallman

6735

## COUNSEL

Suzanne Elliott and Gilbert H. Levy, Seattle, Washington, for the petitioner-appellant.

Rob McKenna, Attorney General, and John J. Samson, Assistant Attorney General, Criminal Justice Division, Olympia, Washington, for the respondent-appellee.

## ORDER

The opinion filed December 8, 2005, and reported at 431 F.3d 661, is withdrawn, and is replaced by the Amended Opinion, 04-35998, filed concurrently herewith. The petition for rehearing is otherwise denied.

A judge requested a vote on whether to rehear this case en banc, but a majority of the non-recused active judges did not

vote in favor of en banc consideration. The petition for rehearing en banc is therefore **DENIED**. *See* Fed. R. App. P. 35. No further petitions for rehearing or rehearing en banc will be accepted.

---

## OPINION

KOZINSKI, Circuit Judge:

We consider the exclusion of jurors for cause in a death penalty case.

## Facts[1]

Cal Brown is not a nice man. In May 1991, he carjacked Holly Washa and drove her to a motel near the Seattle-Tacoma airport. Brown robbed, raped and tortured Washa while holding her hostage for two days. He bound and gagged her, penetrated her with foreign objects, whipped her and shocked her with an electrical cord. Eventually, Brown put Washa in the trunk of her car, slit her throat, stabbed her and left her to bleed to death in a parking lot.

Brown then flew to Palm Springs, California, to rendezvous with his next victim, Susan Schnell, whom he had met on an airplane a few days earlier. While inside their hotel room, Brown similarly robbed and raped Schnell, bound and gagged her, tortured and penetrated her. After handcuffing Schnell to the bed, Brown slit her throat and left her to die. Amazingly, Schnell was able to call the front desk and summon the police, who arrived and arrested Brown in the hotel parking lot.

---

[1]For a more detailed discussion of the facts, see the Washington Supreme Court's opinion in Brown's direct appeal, *State* v. *Brown*, 940 P.2d 546, 555-59 (Wash. 1997) (en banc).

Brown quickly confessed to both the rape and attempted murder of Schnell in California, and the rape and murder of Washa in Washington. After pleading guilty in California and receiving a sentence of life imprisonment, Brown was tried in Washington. A jury convicted Brown of aggravated first-degree murder, and sentenced him to death. Brown exhausted his direct appeals and state habeas proceedings. He then petitioned for a writ of habeas corpus in federal court, raising a number of constitutional claims regarding his trial and sentencing.[2] The district court denied his petition after an evidentiary hearing, and Brown appeals three issues relating to his death sentence.[3]

## Facial Validity of Washington's Death Penalty Statute

Brown challenges the constitutionality of the Washington death penalty statute on its face, arguing that it gives the jury no guidance on how to consider evidence of collateral crimes.

[1] The Washington death penalty statute requires the jury to deliberate on one question only: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" Wash. Rev.

---

[2]Because Brown filed his habeas petition after April 23, 1996, we apply the "substantive review standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ('AEDPA')." *Webster* v. *Woodford*, 369 F.3d 1062, 1066 (9th Cir.), *cert. denied*, 543 U.S. 1007 (2004); *see also Lindh* v. *Murphy*, 521 U.S. 320, 327 (1997).

[3]In his "Statement of Issues," Brown also asks whether his "*conviction* [was] obtained in violation of the Due Process Clause of the Fourteenth Amendment . . . ." (Emphasis added.) But the claims Brown raises in the remainder of his brief relate only to his death sentence, not his conviction. Thus, we will consider only whether Brown is entitled to habeas relief with respect to his death sentence. *See Am. Int'l Enters.* v. *FDIC*, 3 F.3d 1263, 1266 n.5 (9th Cir. 1993) (holding that an issue mentioned in a statement of issues, but not addressed in the argument section of the brief, may be considered abandoned).

Code § 10.95.060(4); *see also id.* § 10.95.070 (setting forth a non-exhaustive list of factors the jury may consider). We have previously upheld the facial validity of the identical Washington statute against a challenge that it "fails to adequately channel and guide jury sentencing discretion." *Campbell* v. *Kincheloe*, 829 F.2d 1453, 1464 (9th Cir. 1987) ("*Campbell I*"). In *Campbell I*, we viewed the statute in light of the construction given to it by the Washington Supreme Court, *see State* v. *Bartholomew*, 683 P.2d 1079, 1086-87 (Wash. 1984) (en banc), and held that the defendant's facial challenge was "meritless." *See Campbell I*, 829 F.2d at 1464; *see also Campbell* v. *Blodgett*, 978 F.2d 1502, 1513-14 (9th Cir. 1992) (per curiam) ("*Campbell II*").

**[2]** Brown's argument in this case is merely a subset of Campbell's facial challenge; he claims that the statute fails to adequately channel and guide jury sentencing discretion *with respect to evidence of collateral convictions*. Thus, our broader holding in *Campbell I*—that the Washington statute does not fail to adequately guide jury discretion with respect to *anything*—necessarily precludes Brown's claim. We have no occasion to reevaluate our earlier assessment of the statute. *See Barapind* v. *Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (per curiam) (noting that rulings by three-judge panels are "law of the circuit," and are binding on subsequent three-judge panels).

### Jury Selection

Brown next argues that three prospective jurors were erroneously dismissed for cause, and that he was therefore sentenced by a "tribunal organized to return a verdict of death." *Witherspoon* v. *Illinois*, 391 U.S. 510, 521 (1968).

**[3] 1.** Juror X was uncertain whether she would be able to impose the death penalty. Though she initially professed a willingness to follow the court's instructions, she later expressed serious reservations: "Oh, yeah, I could follow the

instructions. I think that—actually making that decision, no."
When the court asked her about her ability to vote for death,
she responded, "I don't think I could. It would have to be so
crystal clear. I would have to be—." Based on these
responses, the trial judge properly excused X for cause, find-
ing that her views on the death penalty would "substantially
impair the performance of [her] duties as a juror in accor-
dance with [her] instructions and oath." *Wainwright* v. *Witt*,
469 U.S. 412, 424 (1985) (quoting *Adams* v. *Texas*, 448 U.S.
38, 45 (1980)) (internal quotation mark omitted).

**[4]** Juror Y's voir dire exposed even stronger antipathy
toward the death penalty, bordering on moral outrage. She
described the death penalty as "barbaric" and suggested that
it "makes . . . brutes of us all." She expressed resentment
toward the state of Washington for putting her in the position
of choosing between life and death. Finally, when asked by
the court if she would be able to consider sentencing anyone
to death, Y "crossed her arms, held her hand up . . . and sat
back."[4] The trial judge properly excused juror Y for cause as
well, noting that her impairment was "obvious."

The voir dire examinations of jurors X and Y contrast
sharply with the examination of juror Z. Z expressed no antip-
athy toward the death penalty; to the contrary, he stated that
he "believe[d] in the death penalty." In explaining his views,
Z outlined a balanced and thoughtful position. For example,
Z was discomfited by an earlier era in which "[i]t seemed like

---

[4]It is unclear from the record how Y "held her hand up." Presumably,
she was holding her hand up with her palm out, in a motion often associ-
ated with the exclamation, "Talk to the hand (because the ears ain't listen-
ing)," a phrase later popularized by Fran Drescher in the movie *Beautician
and the Beast*. *See Terms of the 90s, Slang of the Nineties*, http://
www.inthe90s.com/generated/terms.shtml (defining "Talk to the Hand" as
"[a]nother way of saying 'I don't want to hear what you are saying.' ");
*see also* Lynne Truss, *Talk to the Hand: The Utter Bloody Rudeness of the
World Today, or Six Good Reasons to Stay Home and Bolt the Door*
(2005).

. . . [the death penalty] wasn't used at all," because he believed "there [a]re times when it would be appropriate [to impose the death penalty]." But he expressed caution that the death penalty be reserved for "severe situations": "I don't think it should never happen, and I don't think it should happen 10 times a week either." Z felt most comfortable imposing the death penalty where the defendant is "incorrigible and would reviolate if released," and less comfortable where the defendant is found to have been "temporarily insane." But he stated unequivocally that he could consider the death penalty as an option if told to do so.[5]

---

[5]In fact, during the course of his voir dire, juror Z stated *six times* that he could follow the law and impose the death penalty, while not *once* stating that he might not be able to:

Q.  Do you think that you could consider [the death penalty]?

A.  Yes, I could.

. . . .

Q.  [D]oes that mean what I'm hearing you say is that you could consider [the death penalty]?

A.  I believe so, yes.

. . . .

Q.  You would be willing to follow the law?

A.  Yes.

. . . .

Q.  [D]o you think . . . you could impose [the death penalty]?

A.  Yes, sir.

. . . .

Q.  [D]o you think you could also consider and vote for the death penalty under those circumstances?

A.  I could consider it, yes.

Q.  Then could you impose it?

A.  I could if I was convinced that was the appropriate measure.

In essence, Z's views on whether to impose the death penalty mirrored Washington's death penalty statute itself: He believed a defendant should be put to death where his crime was appropriately severe but not otherwise, and was willing to take into account mitigating factors (mental health issues, for example), aggravating factors (likelihood of recidivism, for example) and the particular circumstances of the instant murder. *See* Wash. Rev. Code §§ 10.95.060, 10.95.070. Additionally, he was open to considering other types of mitigating circumstances, such as "somebody's childhood" or "emotional development," was welcoming of his fellow jurors' views, and was accepting of the heavy responsibility assigned to jurors by the state. Most importantly, he promised he would "follow the law" without reservation.

Despite these assurances, the prosecutor protested that Z was too reluctant to impose the death penalty, and that he would only vote for death if convinced that the defendant would "kill again." The prosecutor thus moved to excuse juror Z for cause, and the trial judge granted the motion without further inquiry.

**[5] 2.** In 1985, and again in 1987, the Supreme Court explained that the "standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment . . . is 'whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *Gray* v. *Mississippi*, 481 U.S. 648, 658 (1987) (quoting *Witt*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45)). The Supreme Court insisted that capital jurors not be struck for cause unless they are unable to follow the court's instructions. Even jurors "who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Id.* (quoting *Lockhart* v. *McCree*, 476 U.S. 162, 176 (1986) (Rehnquist, J.)).

**[6]** Further, the Supreme Court significantly circumscribed the state courts' role in excusing jurors for cause in capital cases: It held that

> [t]he State's power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would "frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths." To permit the exclusion for cause of other prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It "stack[s] the deck against the petitioner. To execute [such a] death sentence would deprive him of his life without due process of law."

*Id.* at 658-59 (alterations in original) (citation omitted) (quoting *Witt*, 469 U.S. at 423, and *Witherspoon*, 391 U.S. at 523). Thus, it is—and was at the time of Brown's trial in 1993—clearly established that excusing a juror for cause in a capital case is unconstitutional, absent evidence that the juror would not follow the law.

**[7]** When the Washington Supreme Court upheld the trial judge's decision to excuse jurors X, Y and Z for cause, it found that both X and Y were "substantially impaired" in their ability to perform their duties as jurors. *Brown*, 940 P.2d at 585. Those findings are adequately supported by the record. But a similar finding is missing from the state court's discussion of juror Z. The court's entire review of Z's exclusion from the jury is as follows:

> Appellant did not object at trial to the State's challenge of [Z] for cause. At any rate, [Z] was properly excused. On *voir dire* he indicated he would impose the death penalty where the defendant "would reviolate if released," which is not a correct statement of

> the law. He also misunderstood the State's burden of proof in a criminal case and understood it to be "beyond a shadow of a doubt," although he was corrected later. The trial court did not abuse its discretion in excusing [Z] for cause.

*Id.* Nowhere did the court find that Z would be unable to follow instructions. Nor *could* the court have found this: Just like the juror at issue in *Gray*, juror Z "ultimately stated that [he] could consider the death penalty in an appropriate case." *Gray*, 481 U.S. at 653.[6] Had there been a finding that Z was "substantially impaired" in his ability to follow the law, it would have been unreasonable. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1).[7]

[8] The reasons that the court *did* give for upholding Z's exclusion are misplaced and insufficient. Z's statement that he would impose the death penalty where the defendant would be likely to kill again did not exclude the possibility that Z would vote to impose the death penalty in other circumstances as well.[8] And the fact that Z misstated the law means nothing:

---

[6]The dissent from denial of rehearing en banc agrees that the juror in *Gray* was improperly struck because she "stated unequivocally that she could impose the death penalty without demurrer." Dissent at 6757. In fact, juror Z's commitment to following instructions was far stronger than the juror improperly struck in *Gray*. When Z was asked if he could impose the death penalty, he responded with an unequivocal, "Yes, sir." When the juror in *Gray* was asked if she could vote for the death penalty, she responded only, "I think I could." *Gray*, 481 U.S. at 653 n.5.

[7]The dissent from denial also makes much of juror Z's indecisiveness, a term it uses repeatedly. According to the dissent, this indecisiveness connoted an "inability to properly follow the court's instructions and apply the law." Dissent at 6761. The state has never suggested this novel theory and we do not find it persuasive. If the juror in *Gray* was fit to serve despite her moral scruples against the death penalty, we see no basis for finding juror Z impaired because of his alleged "indecisiveness." Indeed, keeping an open mind as to whether the death penalty is appropriate, before any evidence has even been presented, strikes us as a virtue in a juror, not a basis for disqualification.

[8]Even after learning that life without parole was an alternative to the death penalty, Z unequivocally stated that he would be able to consider

If all prospective jurors who did not fully understand the law before the trial began were struck, only lawyers would be

and impose the death penalty. The dissent from denial makes the following incorrect statement: "Although both defense counsel and the prosecutor explained to him more than once during their voir dire questioning to qualify Juror Z that, if found guilty, Brown would never be released from prison, Juror Z's answers concerning his willingness to impose death in conformance with Washington law were nonetheless confused." Dissent at 6759. Putting aside the fact that being "confused" is hardly the same as being unwilling to follow the court's instructions, juror Z in fact stated unequivocally and repeatedly that he could impose the death penalty. Rather than "[q]uoting selective portions of [the] voir dire transcript," *id.* at 6762, as the dissent does, *see id.* at 6759-60 n.2, we provide the entire relevant transcript of the defense's voir dire:

> Q. Were you aware before that Washington has got this kind of sentence where it's life without parole where you are not ever eligible for parole?
>
> A. I did not until this afternoon.
>
> Q. That is the two options that the jury has if they found the person guilty of premeditated murder beyond a reasonable doubt plus aggravating circumstances beyond a reasonable doubt. Do you think that you could consider both options?
>
> A. *Yes, I could.*
>
> Q. Could you give me an idea sort of [how] you thought about sort of the underlying reason why you think the death penalty is appropriate, what purpose it serves, that kind of thing?
>
> A. I think if a person is, would be incorrigible and would reviolate if released, I think that's the type of situation that would be appropriate.
>
> Q. Okay. Now, knowing that you didn't know before when you were coming to those opinions about the two options that we have here obviously somebody who is not going to get out of jail no matter which sentence you give them if you got to that point of making a decision about the sentence, does that mean what I'm hearing you say is that you could consider either alternative?
>
> A. *I believe so, yes.*

And here is the prosecutor's voir dire on this subject:

allowed to serve on juries (and only a handful of lawyers at that).

[Q.]   I guess the reverse side of what you're saying is, if you could be convinced that he wouldn't kill again, would you find it difficult to vote for the death penalty given a situation where he couldn't kill again?

A.   I think I made that statement more under [the] assumption that a person could be paroled. And it wasn't until today that I became aware that we had a life without parole in the state of Washington.

Q.   And now that you know there is such a thing and they do mean what they say, can you think of a time when you would be willing to impose a death penalty since the person would be locked up for the rest of his life?

A.   I would have to give that some thought. I really, like I said, up until an hour ago did not realize that there was an option of life without parole.

Q.   And I realize this is put on you rather suddenly, but you also recognize as someone who is representing the State in this case, we have made the election to ask that the jury if he is found guilty, ask that the jury vote for the death penalty.

And I'm asking you a very important thing and to everyone in here, whether you, knowing that the person would never get out for the rest of his life, two things. And they're slightly different. One, whether you could consider the death penalty and the second thing I would ask you is whether you could impose the death penalty. I'm not asking a promise or anything.

But I'm asking you, first, could you consider it, and if you could consider it, do you think under the conditions where the man would never get out again you could impose it?

A.   *Yes, sir.*

Q.   So, this idea of him having to kill again to deserve the death penalty is something that you are not firm on, you don't feel that now?

A.   I do feel that way if parole is an option, without parole as an option. *I believe in the death penalty.* Like I said, I'm not sure that there should be a waiting line of people happening every day

**[9]** Z's temporary misunderstanding of the prosecution's burden of proof—he initially thought the prosecution needed to prove guilt "beyond a shadow of a doubt"—was also irrelevant; it would have been easily corrected by the jury instructions, which Z gave every indication he would follow. In fact, the prosecutor himself conceded he was unconcerned with Z's confusion on this point:

> THE COURT: Counsel, any challenge to this particular juror?
>
> [PROSECUTOR]: I would, your Honor, not on the term beyond a shadow of a doubt, I think he would certainly stick with the reasonable doubt standard.

---

or every week even, but *I think in severe situations it's an appropriate measure.*

Q.   But in the situation where a person is locked up for the rest of his life and there is no chance of him ever getting out again, which would be the situation in this case, do you think you could also consider and vote for the death penalty under those circumstances?

A.   *I could consider it, yes.*

Q.   Then could you impose it?

A.   *I could if I was convinced that was the appropriate measure.*

It is true, as the dissent suggests, that we owe the trial judge deference because of his ability to observe demeanor, but demeanor can only shed light on ambiguous language; it cannot contradict the witness's clear words. Here, juror Z's clear words were that he could impose the death penalty and would follow the court's instructions; he never said anything to the contrary. If appellate courts must defer to trial court findings on a transcript such as this because a witness may somehow have contradicted his spoken words through some unknown facial expression or body language, not only is *Witherspoon* a dead letter, but all substantial evidence review of trial court factual findings is obsolete.

And when another juror expressed that she, too, thought the burden of proof was "to a point of a shadow of a doubt," the trial judge dismissed her confusion as unilluminating:

> She doesn't know technically what the definition of beyond a reasonable doubt is. I doubt that anybody in this room knows technically what beyond a reasonable doubt really means and even in your own mind. . . . I was not so concerned with her responses of beyond a shadow of a doubt or crystal clear. I think that definitely could fit within the definition of a reasonable doubt.

[10] Finally, Brown's failure to object to juror Z's removal at trial does not alter the *Witherspoon* error analysis in this case. Brown raised the juror Z claim on direct appeal, and the Washington Supreme Court did not find the claim to be waived or procedurally barred. Nor does appellee allege that the claim is waived or barred, or that it was not exhausted in state court.[9]

---

[9]The dissent from denial makes much of defense counsel's failure to object during voir dire to juror Z's dismissal. *See* dissent at 6755, 6756, 6762, 6767. According to the dissent, defendant's lawyer could not ethically object because even he must have recognized "that Juror Z was properly dismissed for cause." *Id.* at 6762. We find it hard to believe that our colleagues take such an ingenuous view of the realities of the courtroom. As the dissenters must surely understand, defense counsel declined to object because he was glad to get rid of juror Z. After all, Z had described himself as pro-death penalty, and reiterated numerous times, under oath, that he would be willing and able to impose the death penalty. Defense counsel must have thanked his lucky stars when the prosecutor bumped Z.

We know for a fact that the dissent's "scrupulous defense counsel" theory has no basis in reality. As the dissent recognizes, defense counsel did object vigorously to *juror Y's* dismissal for cause. *See* dissent at 6761-62. Juror Y, of course, was the one who had described the death penalty as "barbaric" and as "mak[ing] . . . brutes of us all," and had crossed her arms and held her hand up when asked by the court whether she could sentence anyone to death. *See* p. 6742 & n.4 *supra*. Y was a far better juror for the defense than Z, which is why defense counsel fought so hard to

**[11]** In sum, excusing juror Z for cause was directly contrary to Supreme Court precedent, as was the Washington Supreme Court's decision to uphold the juror strike on direct appeal. *See* 28 U.S.C. § 2254(d)(1).[10]

(Text continued on page 6753)

keep her on the jury and then to have her reinstated. But Y had also disqualified herself under *Witherspoon*. *See* p. 6742 *supra*. Under the dissent's contrived hypothesis, Brown's lawyer would have felt morally compelled to acquiesce in Y's dismissal.

Of course, the fact that Brown's attorney was glad to see juror Z go would seem to make the trial judge's error in this case harmless. But, as we explain below, *Witherspoon* error is structural. *See* section 3 *infra*.

[10]The dissent from denial intones the mantra of *Rice* v. *Collins*, 126 S. Ct. 969 (2006), but forgets that in *Collins*, the state trial court made a factual finding that the juror had been dismissed for race-neutral reasons, and the California Court of Appeal upheld the dismissal based on that finding. *See id.* at 973. The Supreme Court reversed us because we "improperly substituted [our] evaluation of the record for that of the state trial court." *Id.* That is not what happened here. The Washington Supreme Court in this case *applied the wrong standard* with respect to juror Z; it nowhere found that juror Z could not follow his oath.

To compensate for the lack of a proper *Witherspoon* finding, the dissent would impute to the state trial court a finding it never made—one that it, indeed, could not have made on this record—by suggesting that the trial judge must have incorporated the prosecutor's objection: "Excusing Juror Z was based upon the prosecutor's sole reason underlying the objection—a finding that Juror Z could not follow his oath and faithfully apply Washington's capital sentencing law . . . ." Dissent at 6758. But the prosecutor's objection said nothing at all about juror Z's ability or willingness to follow the juror's oath. Here is exactly what the prosecutor said:

> THE COURT: . . . Counsel, any challenge to this particular juror?
>
> [PROSECUTOR]: I would, your Honor, not on the term beyond a shadow of a doubt, I think he would certainly stick with the reasonable doubt standard. But I think he is very confused about the statements where he said that if a person can't kill again, in other words, he's locked up for the rest of his life, he said, basically, he could vote for the death penalty if it was proved beyond a shadow of. And I am certainly going to concede that he means beyond a reasonable doubt. And if a person kills and will kill again. And I think he has some real problems with that. He said

he hadn't really thought about it. And I don't think at this period of time he's had an opportunity to think about it, and I don't think he said anything that overcame this idea of he must kill again before he imposed the death penalty or be in a position to kill again. So, that is my only challenge.

As can readily be seen, the prosecutor says nothing about the juror's oath or whether juror Z will follow it. Rather, the prosecutor concentrates (like the dissent) on the question of whether juror Z would be willing to impose the death penalty if the alternative were life without parole. And (like the dissent) he gets it wrong. *See* n. 8 *supra*. The prosecutor's reason for striking juror Z comes only two pages after juror Z's statement, yet stands juror Z's words entirely on their head. If the trial judge uncritically incorporated the prosecutor's statement into his ruling, as the dissent suggests, the trial judge simply nodded.

The undisputable fact is there is nothing whatsoever in juror Z's voir dire that lends the least support for the finding—explicit or implicit—that he would not follow his oath. This is a juror who listed himself as pro-death penalty in his juror questionnaire and stated repeatedly under oath that he believes in the death penalty. He did not perhaps show the kind of bloodthirsty eagerness for its imposition that the prosecutor may have preferred—juror Z did say he "would have to give [the matter] some thought" and reserved the right to impose the death penalty only when he "was convinced [it] was the appropriate measure"—but there is nothing in his testimony that could remotely support the view that he would not faithfully follow the court's instructions. No degree of deference, nor allowance for facial expressions and demeanor, can possibly fill in what isn't there: the least indication that juror Z could not or would not follow the law. If it *were* there, we are confident the dissent would have quoted it.

Curiously, our dissenting colleagues themselves seem to be confused about Washington's death penalty jury instructions. The dissent states: "There is no question that the *aggravated circumstances* of this case— kidnapping, torture, and the sadistic murder of the victim—would clearly warrant application of the death penalty under Washington law." Dissent at 6763 (emphasis added). Despite the law's insistence that juries consider only *mitigating* circumstances in deciding whether a defendant should be sentenced to death, *see* Wash. Rev. Code. § 10.95.060(4); *see also* p. 6740-41 *supra*, the dissenters are transfixed by the unquestioned heinousness of Brown's crime. *See* dissent at 6763; *see also id.* at 6755 ("The facts are sickening."). The dissent even states that "[t]he trial judge obviously had [the aggravated circumstances of this case] in mind when dis-

**[12] 3.** Having found that juror Z was erroneously excluded, it is unnecessary for Brown to demonstrate he was prejudiced by Z's exclusion. Prejudice is presumed. The Supreme Court has been equally clear on this point:

> [T]his Court in *Davis* surely established a *per se* rule requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under *Witherspoon* is eligible to serve, has been erroneously excluded for cause. . . .
>
> . . . The instant case presents yet another opportunity for this Court to adopt a harmless-error analysis and once again we decline to do so.

*Gray*, 481 U.S. at 659-60 (citing *Davis* v. *Georgia*, 429 U.S. 122, 123-24 (1976) (per curiam) (Rehnquist, J., dissenting)). Thus, Brown's death sentence cannot stand.[11]

## Ineffective Assistance of Counsel

Brown's final claim is that his attorney provided ineffective assistance in various ways during the sentencing phase of his trial. Were we not granting habeas relief with respect to

---

missing Juror Z . . . ." *Id.* at 6763. Were this true, of course, there would have been even more blatant *Witherspoon* error; nothing in *Witherspoon* allows a judge to take the atrociousness of the defendant's crime into account when deciding whether to dismiss a juror for cause.

[11]We find no constitutional infirmity with Brown's conviction. *See Bumper* v. *North Carolina*, 391 U.S. 543, 545 (1968) (holding that *Witherspoon* error requires setting aside a death sentence, but is insufficient to require setting aside a conviction); *see also Gray*, 481 U.S. at 668 (finding that a juror was erroneously excluded from the jury in violation of *Witherspoon* and *Witt*, and holding that "[t]he judgment of the Supreme Court of Mississippi, *insofar as it imposes the death sentence*, is reversed" (emphasis added)).

Brown's sentence for the reasons set forth above, this claim would merit significant attention. Should the state choose to seek the death penalty again on remand, however, Brown will have a new opportunity to receive effective assistance of counsel. We therefore need not reach this claim.

We also do not reach the newly certified issue subsumed within Brown's ineffective assistance of counsel claim—whether the district court erred by refusing to consider certain reports in its habeas evidentiary hearing. We are reversing the district court's decision regardless of whether it should have admitted the evidence.

\*      \*      \*

We reverse the district court's judgment denying the writ of habeas corpus and remand for issuance of a writ with respect to Brown's sentence, unless within a reasonable time set by the district court the state conducts a new penalty phase trial or vacates Brown's death sentence and imposes a lesser sentence consistent with law.

**REVERSED IN PART; REMANDED.**

---

TALLMAN, Circuit Judge, with whom O'SCANNLAIN, KLEINFELD, CALLAHAN, and BEA, Circuit Judges, join, dissenting from denial of rehearing en banc:

Contrary to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. § 2241, *et seq.*), our court overturns a fitting punishment for a just aggravated murder conviction. To do it, our panel impermissibly substitutes its own evaluation of the trial judge's discretionary ruling to dismiss a prospective juror for cause during jury selection in this capital case, notwithstanding the inherent

limitations of a written transcript and the fact that defense counsel stated immediately before the court excused the prospective juror, "We have no objection." The opinion fails to give appropriate AEDPA deference to the determination of the Washington Supreme Court which approved the trial judge's reasonable and more informed approach to jury selection in qualifying the venire. I respectfully dissent from the denial of rehearing en banc.

*Rice v. Collins*, 126 S. Ct. 969 (2006), reiterates our limited role and authority under AEDPA by recognizing the need for highly deferential review of a trial court's decisions in jury selection because of the constraints of a printed record, which may not adequately portray what happened in the courtroom during voir dire. Even under the standard developed in *Gray v. Mississippi*, 481 U.S. 648 (1987), for reviewing jury selection in death penalty cases, we still must afford deference to the trial court's determination that a potential juror would be "substantially impair[ed in] the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 658 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). The defense expressly declared that it had no objection when the prosecutor moved to dismiss the venireman for cause. Nor did the defense later ask the court to reconsider his dismissal as it did for another prospective juror, who was also excused from jury service for cause. Overturning the appropriate sentence in this heinous case is legally unwarranted and nonsensical.

I

The facts are sickening. Brown kidnaped at random a woman who had just finished her shift as a hotel desk clerk near the Seattle-Tacoma International Airport. He stripped, bound, and gagged her, then proceeded to rape, sodomize, and slowly torture her over a two-day period before killing her in a manner which was anything but quick and painless. He was captured in Palm Springs, California, where he had continued

his sadistic crime spree by taking captive yet another victim. The Palm Springs victim escaped her bonds to summon police and lived to testify against Brown.

During jury selection in Washington's King County Superior Court an experienced trial judge dismissed a prospective juror, Juror Z, for cause after he equivocated on whether he could impose the death penalty in conformance with Washington law by suggesting that he thought the punishment should be limited to those cases where the defendant was likely to re-offend. Juror Z was examined about that view. After both sides took the opportunity to lead the venireman through the questioning of his views, and after the judge had also asked questions of him, the prosecutor challenged Juror Z's qualification to serve based on his erroneous beliefs about the death penalty under Washington law. The defense answered, "We have no objection." The trial judge then excused Juror Z for cause. On appeal, the Washington Supreme Court rejected the argument that Juror Z should not have been excused and affirmed the ruling of the trial court.

Our court's opinion labels the Washington Supreme Court's reasons for affirming the dismissal "misplaced and insufficient." Opinion at 6746. But the panel determined solely by reading the transcript, and contrary to the findings of both state courts, that Juror Z was in fact able to follow the law and could impose the death penalty in proper situations. *Id.* at 6746, 6749-51. In doing so, our opinion erroneously holds that the Washington Supreme Court made a decision that was both contrary to clearly established federal law, as determined by the Supreme Court in *Gray*, and was based on an unreasonable determination of the facts in light of the record. *Id.*; *see* 28 U.S.C. § 2254(d). Yet to reach this result under AEDPA, the dismissal must have been both objectively unreasonable in that "the state court was not merely wrong, but actually unreasonable," *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), and the "state court [must have] confront[ed] a set of facts that are materially indistinguishable from

a decision of [the Supreme Court] and nevertheless arrive[d] at a result different from [Supreme Court] precedent," *Williams v. Taylor*, 529 U.S. 362, 406 (2000). Neither is the case.

## II

In *Gray*, the Supreme Court reversed a Mississippi Supreme Court decision which held that it was harmless error for a state court to dismiss a potential juror for cause after the juror said she could impose the death penalty notwithstanding her views in opposition to it. 481 U.S. at 667-68. The Court concluded that, unless "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath[,]" the trial court may not dismiss a potential juror in a death penalty case for cause. *Id.* at 658 (internal quotation marks and citation omitted). This determination is not subject to harmless error review. *Id.* at 660.

Unlike here, the trial judge in *Gray* explicitly found that the potential juror, Mrs. H. C. Bounds, was capable of voting to impose the death penalty, but granted the dismissal anyway. *Id.* at 653-55. Bounds stated unequivocally that she could impose the death penalty without demurrer. *See id.* at 653 n.5. Nevertheless, even if Bounds had expressed hesitation, the Supreme Court held that a death penalty verdict must be vacated when "a potential juror, who has conscientious scruples against the death penalty but who nevertheless . . . is eligible to serve, has been erroneously excluded for cause." *Id.* at 659.

Still, under *Gray*, it is permissible to remove from the venire "those jurors who would frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths." *Id.* at 658 (quoting *Wainwright*, 469 U.S. at 423) (internal quotation marks omitted). Since judges of the Washington Superior and Supreme Courts and a United States District Judge all found that Juror

Z articulated an erroneous standard for imposing a sentence of death under state law, how can three federal judges on appeal now say, on this record, that it was objectively unreasonable for those courts to conclude that he could not follow the juror's oath? Excusing Juror Z was based upon the prosecutor's sole reason underlying the objection—a finding that Juror Z could not follow his oath and faithfully apply Washington's capital sentencing law, primarily because of his confusion and uncertainty, as reflected throughout the entire voir dire, about when he should appropriately consider the death penalty.[1]

While our opinion cites to the guidelines set forth in *Gray*, it fails to accord those guidelines the AEDPA deference due to a state court's determination as to which jurors are "substantially impaired." On the record before our panel, the trial judge's dismissal of Juror Z could not be interpreted as "objectively unreasonable," nor is the factual situation in *Gray* sufficiently similar to conclude that the trial court's dismissal was contrary to the rule announced in *Gray*. The dismissal was simply a reasonable judgment call made by the only judge who actually saw and heard Juror Z during voir dire. There is no showing on the record that the trial judge or the Washington Supreme Court misapplied United States Supreme Court precedent. As the United States district judge so aptly observed in denying habeas relief on this ground, "Even if this Court would not have dismissed the jurors for cause, it cannot substitute its judgment for that of the state courts." Yet our panel does just that. The real question then is whether the Washington Superior and Supreme Courts made an objectively unreasonable determination of the facts in light of the record. They did not.

---

[1]What the prosecutor said to support the motion to excuse Juror Z was, in relevant part:

> I don't think he said anything that overcame this idea of he must kill again before he imposed the death penalty or be in a position to kill again. So, that is my only challenge.

Juror Z stated several times that his ability to impose the death penalty was dependent on whether the defendant was likely to re-offend, which is not the standard for imposition of the death penalty in an aggravated murder case under Washington law. *See* Wash. Rev. Code § 10.95.060(4). Although both defense counsel and the prosecutor explained to him more than once during their voir dire questioning to qualify Juror Z that, if found guilty, Brown would never be released from prison, Juror Z's answers concerning his willingness to impose death in conformance with Washington law were nonetheless confused.[2] The trial judge explained twice to

---

[2]Defense counsel explained to Juror Z that the jury would consider two sentencing options should Brown be found guilty—life without parole and the death penalty. At this point, Juror Z stated that he could consider both options. However, Juror Z then explained that he believed the death sentence would be appropriate if a person "would be incorrigible and would reviolate if released." Defense counsel once again explained the idea of life without parole, and Juror Z again said he could consider both options.

Shortly thereafter, this exchange occurred between defense counsel and Juror Z:

Q. Understanding that the two options there are life without parole or the death penalty, there is not a lot of likelihood that people are going to spend a lot of time talking about whether or not they're going to kill again in the sentencing phase of this case. Is that going to make you frustrated? Are you going to want to hear about things like that, about people's opinions in the penalty phase?

A. I'm not sure.

Even after defense counsel explained that Brown would receive either life without parole or the death penalty if found guilty, and after Juror Z claimed he could consider both options, he still misstated Washington law. While the prosecutor was questioning Juror Z about his incorrect perception of the standard of review ("beyond a shadow of a doubt" instead of "beyond a reasonable doubt"), the following exchange occurred:

Q. So, I want to ask you, the thing that bothers me, is the idea beyond a shadow of a doubt. The law says beyond a reasonable doubt, and it will be explained to you what it actually means. But I want to assure you it doesn't mean, I don't believe the Court

potential jurors, prior to Juror Z's voir dire, that life without parole was an option that the jury could consider.[3] However,

> would instruct you it means beyond all doubt or beyond any shadow of a doubt. Knowing that, would you still require the State to prove beyond a shadow of a doubt that the crime occurred knowing that the law doesn't require that much of us?
>
> A.   I would have to know the, I'm at a loss for the words here.
>
> Q.   You can ask me any questions, too, if you need some clarification.
>
> A.   I guess it would have to be in my mind very obvious that the person would reoffend.

A little while later, the prosecutor once again explained that life without parole was a sentencing option should Brown be found guilty. The prosecutor asked, "[C]an you think of a time when you would be willing to impose a death penalty since the person would be locked up for the rest of his life?" Juror Z responded:

> "I would have to give that some thought. I really, like I said, up until an hour ago did not realize that there was an option of life without parole."

Contrary to the panel's assertion that Juror Z "unequivocally stated that he would be able to consider and impose the death penalty," Juror Z in fact exhibited quite a bit of confusion and equivocation through his uncertain answers as to when he would be willing to impose the death penalty. Juror Z saying in one breath that he could follow the law, and then in the next breath misstating the law, is not an unequivocal declaration that "he would be able to consider and impose the death penalty" as required under Washington law.

[3]On October 25, 1993, the trial judge instructed half the potential jury pool, including Juror Z, on Washington death penalty law. Specifically, the judge explained that the jury "would . . . retire to determine whether the death penalty should be imposed or whether the punishment should be life imprisonment without the possibility of parole." He further stated that, "[i]n making that determination, [each juror] would be asked the following question: Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

Furthermore, on November 3, 1993, when Juror Z was brought back for individual questioning, the trial judge informed all potential jurors that

even after multiple explanations by the judge, prosecutor and defense counsel, Juror Z did not grasp, nor could he be certain about, the appropriate circumstances in which as a juror he would consider imposing the death penalty. The prosecutor correctly summarized his answers, saying, "I think he is very confused about the statements . . . ." Juror Z stated at times that he could follow the law, but also stated he would "have to give it some thought" once he knew that Brown would not be paroled if found guilty. It was not unreasonable for the trial judge to conclude that, unlike juror Bounds in *Gray*, Juror Z was unfit to serve because of his indecisiveness, suggesting his inability to properly follow the court's instructions and apply the law.

Washington law does not ask the jury during the sentencing phase of a death penalty case to consider whether the defendant would re-offend. Instead, it asks the jury whether it is convinced "beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency[.]" WASH. REV. CODE § 10.95.060(4). This standard says nothing about proclivity to reoffend. It was not error for the judge to decide that Juror Z could not honestly abide by his oath to follow the law as instructed. The panel ignores the deferential AEDPA standard of review it must accord the Washington courts when it declares that any finding that Juror Z was impaired would be unreasonable.

### III

Conspicuous by its absence is any motion by the defense during voir dire to challenge or reconsider the determination

---

"[i]t is the State's burden to prove to [the jury] beyond a reasonable doubt the appropriate penalty, since there are only two penalties a jury could return, one is prison without the possibility of release or parole." He reiterated, "that literally means exactly that, a true life in prison without release or parole, or the penalty of death."

to remove Juror Z. Defense counsel did move in writing for reconsideration of the trial court's dismissal for cause of Juror Y, an attorney who had expressed strong reservations about the death penalty, although stating that she thought she could consider it if required. Brown filed his mid-voir dire motion to recall Juror Y or declare a mistrial and qualify a new jury panel because Brown felt that Juror Y was erroneously dismissed for cause. A few days later, Brown also filed a motion to reconsider the trial court's denial of challenges for cause regarding two other venireman who favored imposition of the death penalty. But there was no motion regarding Juror Z. Nor has Brown ever claimed defense counsel's actions during voir dire in letting Juror Z be excused from service constituted ineffective assistance of counsel.

Quite clearly those who had the opportunity to watch Juror Z's testimony, including the trial judge, the prosecution, and defense counsel, both during and after questioning him on voir dire, felt that Juror Z was properly dismissed for cause. Our panel nonetheless has held, after reviewing only the written record of Juror Z's oral voir dire, that such a determination is or would be objectively unreasonable. Given the substance of the entire record, and the constraints of our limited role as a federal habeas court, the panel has overstepped its authority under AEDPA. Congress surely intended through enacting AEDPA to end the practice by some federal judges of granting habeas relief to overturn state capital cases on rulings that even the parties did not urge to be erroneous when trying their case.

IV

Quoting selective portions of a voir dire transcript to support a particular view of the trial court's performance ignores the reality of jury selection. The voir dire process is far more complex than a simple reading of a transcript. In some cases, it will be crystal clear that a particular venireman is eligible to serve on a jury, but this is not one of those cases. Experi-

enced trial lawyers know that there are intangible factors that influence the decision to accept or reject prospective jurors which cannot be reduced to written text in a cold record. There is no question that the aggravated circumstances of this case—kidnaping, torture, and the sadistic murder of the victim—would clearly warrant application of the death penalty under Washington law. The trial judge obviously had this in mind when dismissing Juror Z after his repeated statements that he would impose the death penalty only if convinced that Brown would likely re-offend, a condition Washington law does not require to impose a sentence of death.

Juror Z wavered back and forth between claiming to understand what he was being told about when the Washington capital sentencing law applied, yet he reiterated his erroneous belief that death was applicable only for recidivists. The transcript reflects that he seemed easily led by both the prosecution and defense counsel into declaring an understanding that everyone in the courtroom recognized he simply did not have. This is why deference to the trial court and the fact that neither party wanted this juror are important considerations in applying AEDPA's "objectively unreasonable" standard of review. A trial judge will note pauses, hesitations, and nonverbal expressions (body language) that will factor into his decision to dismiss a potential juror:

> The way they use their hands, their eyes, their facial expression, their frankness or hesitation in answering, are all matters that do not appear in the transcribed record of the questions and answers. They are available to the trial court in forming its opinion of the impartiality and fitness of the person to be a juror.

*State v. Noltie*, 116 Wn. 2d 831, 839, 809 P.2d 190 (1991), *quoting* 14 L. Orland & K. Tegland, WASH. PRAC., *Trial Practice* § 202, at p. 332 (4th ed. 1986). In denying Brown's motion to reconsider dismissing for cause Juror Y, the trial

judge explained how he analyzed potential jurors to determine whether they are substantially impaired:

> [T]here is not any one particular response from any one of these jurors I think that is definitive for the most part. It's more of a total overall impression from everything that they have said. With [Juror Y] I guess what was most convincing was her body posture, the things that were unsaid because of the fact of the way she crossed her arms, sat back and what she was telling us at that point in time.

The "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism," *Wainwright*, 469 U.S. at 424, yet our *Brown* panel does just that. Rather than respecting the trial judge's more informed interpretation of Juror Z's demeanor, tone, and words, our panel substitutes its view, based solely on the written record, to form its own interpretation. There is a reason AEDPA requires that appellate courts give appropriate deference to trial courts during voir dire:

> Despite [the] lack of clarity in the printed record . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 425-26. This case trenchantly illustrates the need for such deference.

*Rice v. Collins* reiterates that such deference is required when a trial court finds cause for juror bias. In *Collins*, the petitioner brought a *Batson* challenge to a peremptory strike of a young African-American woman, Juror 16, who the prosecutor believed did not have sufficient ties to the community because of her youth, and who may have been too tolerant of

the crime with which the respondent was charged. 126 S. Ct. at 973. The California Court of Appeal upheld the trial court's ruling on the peremptory challenge to credit the prosecutor's race-neutral explanations for striking Juror 16. *Id.* The district court dismissed Collins's habeas petition with prejudice. *Id.* We reversed, concluding that the state appellate court made an unreasonable factual determination in crediting the prosecutor's race-neutral reasons for striking Juror 16. *Id.*

In a unanimous decision, the Supreme Court reversed us. It held that, although we recited the proper standard of review under 28 U.S.C. § 2254(d)(2), "the panel majority improperly substituted its evaluation of the record for that of the state trial court." *Id.* "State-court factual findings . . . are presumed correct [and] the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' " *Id.* at 974 (quoting 28 U.S.C. § 2254(e)(1)). Juror 16 replied affirmatively when asked whether she believed that the crime with which the respondent had been charged should be illegal, and disclaimed any other reason she could not be impartial. *Id.* at 975. However, the Court determined that even if "the prosecutor [still] claimed to hold [race-neutral] concerns despite Juror 16's voir dire averments[, this] does not establish that she offered a pretext." *Id*. In other words, the prosecutor did not have to accept the voir dire statements of Juror 16 when there were other race-neutral grounds for the peremptory challenge.

Here, the *Brown* panel seizes upon Juror Z's statement that he would be able to consider the option of the death penalty as a basis for its determination that the prosecutor's reason for striking Juror Z, and the trial court's willingness to credit that reason, was objectively unreasonable. But Juror Z's willingness to impose the death penalty was accompanied by his indecisiveness and an expressed viewpoint which, if followed, would result in the misapplication of Washington law. Rather than examining piecemeal the individual statements of Juror Z, the trial judge could appropriately consider Juror Z's

inconsistent statements and his uncertainty as reflected throughout the entire voir dire process as a reasonable basis for his exclusion. Under *Collins*, the trial judge did not have to accept Juror Z's isolated declarations that he could follow the law if the totality of Juror Z's voir dire examination reflected his general confusion and indecisiveness about the proper application of the death penalty.

"Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 976. Although some might find that Juror Z had eschewed and rejected his prior improper basis for application of the death penalty, a reasonable mind could just as easily find that he *had not* eschewed and rejected that basis. The trial judge, as trier of fact on challenges during voir dire, is entitled to the same latitude as a jury determining the credibility of trial witnesses when judging whether a potential juror is able to serve. The superior court judge had the responsibility of weighing Juror Z's various inconsistent statements to determine Juror Z's true ability to faithfully perform his duties as a juror by applying Washington law. He had the opportunity to watch the prospective juror testify; we did not.

V

Finally, the Washington Supreme Court need not *explicitly* declare that Juror Z was "substantially impaired" for its affirmance to count under AEDPA. True, the appellate court did not incant the words "substantially impaired." But based upon the rulings of both the trial and appellate courts, and the record in this case, we can certainly conclude that the Washington courts found appropriate the decision to excuse Juror Z on the only ground proffered by the prosecutor—that he could not discharge his oath as a juror to follow state death penalty law. While the record may be susceptible to different interpretations by reasonable jurists, AEDPA demands that we must be able to conclude that the decision was "objec-

tively unreasonable" to grant relief. That standard is simply not met here.

By listening to the voir dire statements of Juror Z, watching how he answered specific questions during voir dire, considering the prosecutor's reason for wanting to dismiss Juror Z for cause, and hearing the defense state that it had no objection to the motion, the trial judge implicitly found that Juror Z was "substantially impaired" by excusing him for cause. Nothing more is required. *See Wainwright*, 469 U.S. at 430. The Supreme Court in *Wainwright* said that in making rulings on voir dire objections, the judge is not "required to announce for the record his conclusion that [the potential juror] was biased, or his reasoning," when "[t]he finding is evident from the record." *Id.* It is especially telling when the defendant does not object to the dismissal, as was the case when Brown's lawyer rose before the court and expressly stated that she had no objection to excusing Juror Z.

We must afford the same presumption of correctness to the Washington Supreme Court in reviewing the trial court's factual determination of juror bias. *See Tinsley v. Borg*, 895 F.2d 520, 526 (9th Cir. 1990) ("Even though the state appellate court is, in a sense, in no better position than we are to evaluate the state trial court record, [the habeas statute] requires us to accord the same presumption of correctness to its factual findings."). Specifically, the Washington Supreme Court concluded in reference to Juror Z's voir dire:

> Appellant did not object at trial to the State's challenge of [Juror Z] for cause. At any rate, [Juror Z] was properly excused. On *voir dire* he indicated he would impose the death penalty where the defendant "would reviolate if released," which is not a correct statement of the law. He also misunderstood the State's burden of proof in a criminal case and understood it to be "beyond a shadow of a doubt," although he was corrected later. The trial court did

not abuse its discretion in excusing [Juror Z] for
cause.

*Washington v. Brown*, 940 P.2d 546, 585 (Wash. 1997).

Whether or not the Washington Supreme Court intoned the
magic words, "substantially impaired," it affirmed the trial
court because of Juror Z's erroneous belief about when the
death penalty should be applied under Washington law. By
doing so, it impliedly determined Juror Z would be substan-
tially impaired in his duties as a juror to follow the law by
holding that he was properly dismissed for cause.

## VI

This opinion unfairly rids the trial court of the discretion it
must necessarily possess in determining juror bias in death
penalty cases. Ostensibly, *Brown* stands for the proposition
that if the written record is not absolutely and explicitly clear
as to whether a dismissed juror could not correctly deliberate
on imposition of the death penalty, we must vacate the death
sentence if that juror was nonetheless dismissed by the judge
who watched him respond to the questions on voir dire with-
out defense objection. That is simply not the way the Supreme
Court has directed us to review jury selection under AEDPA,
even after *Gray*. *See Collins*, 126 S. Ct. at 973-75; *supra*,
§ IV. Indeed, *Wainwright* declared prior to *Collins* that decid-
ing to dismiss a potential juror "does not require that a juror's
bias be proved with unmistakable clarity." 469 U.S. at 424
(internal quotation marks omitted). While we do not and will
not rubber stamp on habeas review juror dismissals in death
penalty cases, AEDPA surely requires more deference to the
Washington courts than that paid by our court in this one.

Finally, this opinion impermissibly lowers the level of def-
erence which comity demands that we as a federal habeas
court afford state courts in reviewing their decisions and find-
ings of fact. *Brown*'s lower standard of "reasonableness

review" severely handicaps a trial judge's ability to go beyond the scope of mere words and phrases taken piecemeal from the entire voir dire process. This new standard ignores the need for litigants and the trial judge to interpret the prospective venireman's answers, considering them along with body language and demeanor. Because AEDPA, as reinforced by the Supreme Court, commands greater comity when federal courts review these kinds of practical decisions by experienced state judges in capital cases, I respectfully dissent from our court's unwillingness to rehear this case en banc.